IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES,                    )
                                  )
          v.                      )
                                  )
WILLIAM DANIELCZYK, Jr., &        )    1:11cr85 (JCC)
EUGENE BIAGI,                     )
                                  )
     Defendants.                  )

# M E M O R A N D U M   O P I N I O N

This case involves an alleged scheme of recruiting donors and reimbursing their contributions to Hillary Clinton's 2006 and 2008 Senate and Presidential Campaigns.  Defendants' motions to dismiss raise significant questions of statutory construction, *mens rea*, and Congress's ability to ban direct corporate contributions in the wake of the Supreme Court's decision in *Citizens United v. FEC*, 130 U.S. 876 (2010).  For the following reasons, the Court will grant in part and deny in part Defendants' motions.

## I. Background

On February 16, 2011, a grand jury sitting in the Eastern District of Virginia returned a seven-count indictment against William P. Danielczyk, Jr. and Eugene R. Biagi (together, "Defendants"), charging them with illegally

soliciting and reimbursing contributions to Hillary Clinton's 2006 Senate Campaign ("Senate Campaign") and 2008 Presidential Campaign ("Presidential Campaign").  (Indictment [Dkt. 1] ("Indict.").)  The Government alleges that Mr. Danielczyk, as Chairman of Galen Capital Group, LLC, and Galen Capital Corporation (together, "Galen") and Mr. Biagi, as an executive at Galen, subverted federal campaign contribution limits by reimbursing their employees' costs of attending two fundraisers Mr. Danielczyk co-hosted for the two campaigns.

Count One charges conspiracy in violation of 18 U.S.C. § 371, Counts Two and Three charge making campaign contributions in the name of another in violation of 2 U.S.C. § 441f and 18 U.S.C. § 2, Count Four charges corporate contributions in violation of 2 U.S.C. § 441b and 18 U.S.C. § 2, Count Five charges obstruction of justice in violation of 18 U.S.C. §§ 1519 and Two, and Counts Six and Seven charge causing false statements in violation of 18 U.S.C. §§ 1001(a)(2) and 2 and are directed solely towards Mr. Danielczyk.  Joint trial is set for July 6, 2011.

Defendants filed motions to dismiss a number of these counts on April 6, 2011. [Dkt. 23 ("Biagi MTD"); Dkt. 28 ("Danielczyk MTD").]  The Government filed a brief in opposition on April 19, 2011 [Dkt. 37 ("Opp.")], and Defendants filed briefs in reply on April 25, 2011 [Dkt. 46 ("Danielczyk Reply");

Dkt. 49 ("Biagi Reply")].  Defendants' motions are before the
Court.

## II. Standard of Review

Federal Rule of Criminal Procedure 12(b)(3)(B) permits
a defendant to move for dismissal pre-trial (or at any time
while the case is pending) if an indictment fails to state an
offense.  "[A]n indictment need merely contain a 'plain,
concise, and definite written statement of the essential facts
constituting the offense charged.'"  *United States v. Rendelman*,
--- F.3d ----, No. 08-4486, 2011 WL 1335781, at *5 (4th Cir.
Apr. 8, 2011) (quoting Fed. R. Crim. P. 7(c)(1)).

An indictment is legally sufficient if (i) it contains
the elements of the offense charged and informs the defendant of
the charges he must meet, and (ii) it identifies the offense
conduct with sufficient specificity to allow the defendant to
plead double jeopardy should there be a later prosecution based
on the same facts.  *United States v. Jefferson*, 562 F. Supp. 2d
687, 690 (E.D. Va. 2008) (citing *Russell v. United States*, 369
U.S. 749, 763-64 (1962)).  The first prong of this standard
tests the "legal sufficiency" of a charged offense, "namely
whether the facts alleged satisfy each of the requisite
statutory elements of a[n] . . . offense."  *Jefferson*, 562 F.
Supp. 2d at 690.

In testing the sufficiency of an indictment, the
indictment's statement of facts controls the inquiry, not the
statutory citations for the underlying offenses. *United States
v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988). "[E]very
ingredient of crime must be charged in the bill, a general
reference to the provisions of the statute being insufficient."
*Id*. at 1228 (quoting *Hale v. United States*, 89 F.2d 578, 579
(4th Cir. 1937)). Generally, an indictment is sufficient if it
alleges an offense in the words of the statute, as long as the
words used in the indictment "'fully, directly and expressly,
without any uncertainty or ambiguity, set forth all the elements
necessary to constitute the offence.'" *United States v.
Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (quoting *Hamling v.
United States*, 418 U.S. 87, 117 (1974)). Moreover, each count
of an indictment must itself be legally sufficient. *Hooker*, 841
F.2d at 1230-31. Thus, a missing element from a challenged
count cannot be borrowed from another count if it is not
incorporated by reference. *Id*. at 1231. Nonetheless, the
determination of an indictment's validity is based on practical
not technical concerns. *United States v. Matzkin*, 14 F.3d 1014,
1019 (4th Cir. 1994).

### III. Analysis

Defendants argue the following in favor of dismissal.
First, that Counts Two and Three cannot apply to their charged

conduct as a matter of statutory construction.  Second, that

Defendants could not have had the requisite *mens rea* for Counts

Two and Three, as well as Six and Seven.  Third, that the

statute underlying Count Four was rendered unconstitutional by

the Supreme Court's recent decision in *Citizens United v. FEC*,

130 U.S. 876 (2010).  Fourth, that a bill of particulars is

required for Count Six.  And fifth, that the objects of the

conspiracy alleged in Count One that rely on Counts Two, Three,

and Four must be dismissed.

The Court considers these arguments in turn.

A.    Statutory Construction of § 441f (Counts Two &
      Three)

Counts Two and Three charge the Defendants with

violating 2 U.S.C. § 441f, which states in relevant part:

No person shall make a contribution in the
name of another person.

The *mens rea* for § 441f is stated in 2 U.S.C. § 437g(d)(1)(D),

and applies to

[a]ny person who knowingly and willfully
commits a violation of § 441f.

2 U.S.C. § 437g(d)(1)(D).  In addition, Counts Two and Three

involve 18 U.S.C. § 2(b), which states,

Whoever willfully causes an act to be done
which if directly performed by him or
another would be an offense against the
United States, is punishable as a
principal.

The Indictment alleges that, in connection with fundraisers held on September 18, 2006, for the Senate Campaign and March 27, 2007, for the Presidential Campaign, Mr. Danielczyk "recruited individuals to make contributions" to Clinton's campaigns "and assured contributors that they would be reimbursed for their contributions." Indict. ¶ 12.a.i. Mr. Danielczyk's assistant allegedly "collected certain contributions from the contributors," which were "transmitted to the authorized campaign committees." Indict. ¶ 12.a.ii. Defendants then allegedly caused Galen to "reimburse[ ] [the] contributions." Indict. ¶ 12.a.iii.[1]

Count Two alleges that Defendants "caused $30,200 in contributions to the 2006 Senate [C]ampaign using" the names of others and "caused the reimbursement of those contributions" using money from Galen. Indict. ¶ 13.a. Count Three alleges that Defendants "caused $156,400 in contributions to the 2008 Presidential [C]ampaign using" the names of others and "caused the reimbursement of those contributions" using money from Galen. Indict. ¶ 13.b.

Defendants argue that Counts Two and Three fail to state a violation of 2 U.S.C. § 441f. (Danielczyk MTD at 8.)

_____

[1] The Court notes that paragraph 12 of the Indictment is set forth in Count One of the Indictment. Indict. at pp. 4-6. Counts Two and Three of the Indictment each incorporate the Indictment's General Allegations and incorporate Paragraphs 13(a) and 13(b), respectively, but *do not* incorporate Count One. Indict. at pp. 13-14.

According to Defendants, "[r]eimbursing another for his or her contribution is not the same thing as making a contribution in the name of another."  (Danielczyk MTD at 9 (emphasis removed).) Section 441f, on Defendants' read, "prohibits making a contribution to a campaign by falsely using the name of another person, such as by using an assumed name to make a contribution," but "[i]t does not prohibit reimbursing others for contributions they made in their own names."  *Id.*

The Government counters that Defendants offer an "unreasonably narrow reading of the text," and that "[i]n fact, the statutory text and the legislative history all make it plain that a pass-thru scheme using straw donors to conceal the identity of the actual donor, as alleged in the indictment, is unambiguously criminalized by § 441f."  (Opp. at 3 (internal quotation marks and citation removed).)

The issue before the Court, then, is whether § 441f[2] proscribes *only* (1) a donor making a contribution to a campaign but representing himself to the campaign as someone else, which the Court will refer to as a "false-name contribution," or whether it proscribes *also* (2) a donor arranging for another person to contribute funds to the campaign in that other

---

[2] Counts Two and Counts Three charge violations § 441f together with 18 U.S.C. § 2(b) and 2 U.S.C. § 437g(d)(1)(D).  The Court's analysis in addressing § 441f reads it in context with 18 U.S.C. § 2(b) and 2 U.S.C. § 437g(d)(1)(D) except where the Court addresses § 441f's language standing alone.

person's name with the agreement to reimburse that other person, which the Court will refer to as a "pass-through contribution."

Defendants cite four reasons for limiting § 441f to false-name contributions: (1) the statute's text, (2) the statute's structure, (3) the need to avoid superfluity in statutory construction, and (4) the rule of lenity and constitutional concerns.  The Court considers each in turn.

### i.    Statutory Text

Defendants first argue that § 441f's text does not prohibit pass-through contributions.  (Danielczyk MTD at 11.) In support, Defendants state that Congress addressed the issue of making contributions "directly or indirectly," and through "intermediaries or conduits," in other provisions of the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 431, *et seq.*, such as § 441a(a)(8) and § 441b(b)(2),[3] but omitted that language from § 441f.  *Id*.  Because the words "directly or indirectly" and through "intermediaries or conduits" are not in § 441f, Defendants argue, § 441f bans only false-name contributions, not pass-through contributions.  (Danielczyk MTD at 12.)

In interpreting a statute, courts begin with the text of the provision at issue.  *N.Y. State Conference v. Travelers*

---

[3] 2 U.S.C. § 441b(b)(2) provides that "[f]or purposes of this section . . . the term 'contribution or expenditure' includes a contribution or expenditure, as those terms are defined in section 431 . . . and also includes any *direct or indirect* payment . . . to any candidate." (emphasis added).

*Ins. Co.*, 514 U.S. 645, 655 (1995).  The "preeminent canon of statutory interpretation requires [courts] to 'presume that the legislature says in a statute what it means and means in a statute what it says there.'"  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).  The Court is mindful that "[i]n a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."  *Ramey v. Director, Office of Workers' Comp. Program*, 326 F.3d 474, 476 (4th Cir. 2003) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475 (1992)).  A court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous."  *BedRoc Ltd.*, 541 U.S. at 183 (citing *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004)).

To review, § 441f states in relevant part that "[n]o person shall make a contribution in the name of another person." According to Defendants, the Court would have to "rewrite § 441f to include terms that Congress deliberately excluded" for § 441f to reach to the conduct charged here.  (Danielczyk MTD at 11-12.)  The Court disagrees.

As Defendants note, FECA is a comprehensive, reticulated statute. (Danielczyk MTD at 9.) As such, it has a comprehensive definitional section, 2 U.S.C. § 431. "Person" is defined to include "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons." 2 U.S.C. § 431(11). "Contribution" is defined as including "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). Defendants are clearly "persons" and the donations to Clinton's campaigns were clearly "contributions." The issue, then, is what "make" and "in the name of another" mean for purposes of § 441f.

As written, § 441f plainly embraces Defendants' charged conduct. In § 441f, the action happens, literally, with the verb "make." FECA, though comprehensive and reticulated, does not define "make." "When a word is not defined by statute, [courts] normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). As for the ordinary or natural meaning of "make," the American Heritage Dictionary defines "make" as, among other things, "[t]o cause to exist or happen; bring about; create." American Heritage Dictionary of the English Language 1085 (3d ed. 1992). Black's Law Dictionary defines "make," among other

things, as "[t]o cause (something) to exist."  Black's Law
Dictionary 975 (8th ed. 2004).  Thus, the inquiry is whether the
indictment charges Defendants with having "caused a contribution
to exist in the name of another person."

The Court finds that it does.  Defendants allegedly
recruited individuals to make contributions to Clinton's
campaigns under agreements with those individuals that
Defendants would reimburse their donations.  Indict. §§ 11-12ai.
A common sense, logical reading of § 441f holds that this
conduct "made" contributions in the names of those individuals
because the conduct caused those contributions to exist or
happen.  *Accord United States v. Boender*, 691 F. Supp. 2d 833,
838-39 (N.D. Ill. 2010) ("In many areas of law and life, a
person can 'make' something happen though various forms of
action.").  Because the contributions Defendants made, by
causing the contributions to happen, were not in Defendants'
names but in the names of the individuals they recruited, the
contributions were "in the name of another."  Under Defendants'
reading, the only person who "makes" a contribution is the
person who transfers the contribution to the campaign.  That,
however, does not account for the person who caused that
contribution to exist or happen, who, under "ordinary or natural
meaning" also "made" the contribution.  *Smith v. United States*,

508 U.S. at 228.  The natural meaning of "make" renders § 441f unambiguous.

In common usage, one who causes something to happen or brings it about, for instance by funding money, "made" it happen just the same as the person who executed the action, for instance by transferring that money.  As the *Boender* court noted, "the law is no stranger to th[is] concept.  One of the most obvious examples in criminal law relates to the law of murder, which attaches liability where a person causes the death of another even without physically delivering the deathblow." 691 F. Supp. 2d at 838-39.  Indeed, this Court is not the first to apply this reading of § 441f to the conduct charged here. *See, e.g.*, *United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010) ("*O'Donnell II*"); *Boender*, 691 F. Supp. 2d 833; *United States v. Hsu*, 643 F. Supp. 2d 574, 576 (S.D.N.Y. 2009) (upholding sufficiency of evidence for a conviction under § 441f where witnesses testified that, at defendant's request, they made contributions to political campaigns that were contemporaneously or subsequently reimbursed by the defendant); *but see United States v. O'Donnell*, No. CR 08-00872 (C.D. Cal. June 8, 2009) (*O'Donnell I*) (finding that § 441f does not

prohibit soliciting and reimbursing contributions), overruled by *O'Donnell II*.[4]

Defendants argue that because § 441f does not include the term "indirectly," the Court cannot disregard that Defendants' alleged reimbursing transaction was separate from the recruited-individuals' donation transaction. (Danielczyk MTD at 13-14.) But the common meaning of "make" permits the Court to consider Defendants' alleged role within the totality of the transaction. Because "make" means "[t]o cause to exist or happen; bring about; create," American Heritage, *supra*, at 1085, it is not necessary to "merge" the two transactions to bring Defendants' conduct within § 441f. "To cause to exist or happen; bring about; create," *id.*, is broad enough to encompass a number of means, including "indirect" or "conduit" means. As the Ninth Circuit stated:

> to identify the individual who has made the contribution, we must look past the intermediary's essentially ministerial role to the substance of the transaction. Accordingly, the statutory language applies when a defendant's funds go to a campaign either directly from him or through an intermediary. In either case, for purposes of § 441f, the defendant has made that contribution--and he has violated the statute if his own name was not provided as the source.

*O'Donnell*, 608 F.3d at 550. Though the Court does not find it necessary to "look past the intermediary's essentially

---

[4] *O'Donnell I* is the only case cited by Defendants or found by this Court interpreting § 441f as *not* applying to the conduct charged here.

ministerial role to the substance of the transaction," *id.*, for Defendants' charged conduct to come within § 441f, because of the breadth of the term "make," doing so would be proper here. Nonetheless, though *O'Donnell II* is not controlling in this Court, the Court agrees with its reasoning.  Ultimately, the person who "makes" something is the person who caused it to exist or happen, brought it about, or created it.  Thus, Defendants' charged conduct fits squarely within § 441f.

Defendants would have the absence of "directly or indirectly" and "intermediary or conduit," contained § 441a(a)(8) and other FECA provisions but not § 441f, decide the issue.  According to Defendants, § 441f would have to read to the effect of "no person shall make, directly or indirectly, a contribution in the name of another person" or "no person shall make a contribution, including one directed through an intermediary or conduit, in the name of another person." Although these versions may be clearer in Defendant's view, the issue is not whether Congress could have better drafted § 441f, but whether § 441f as written embraces Defendants' charged conduct here.  *See Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989) (stating that a court's "task is to apply the text, not to improve upon it").  And, given the meaning of the word "make," the words "directly or indirectly" and

"intermediary or conduit" are unnecessary for § 441f to capture the conduct charged here.

Though Defendants contend the Government (and this Court) would "rewrite § 441f to include terms that Congress deliberately excluded," (Danielczyk MTD at 11-12), it is actually Defendants' interpretation of the statute that would force a rewrite. "Make" means "to cause to exist or happen; bring about; create," such that the person who brought something about or caused something to happen "made" that thing. To read § 441f as Defendants suggest would *limit* the common meaning of "make." The statute would have to read to the effect of "no person shall make, *by transferring the contribution directly from herself to the contributee*, a contribution in the name of another person," or "no person shall *execute* a contribution in the name of another person." That, however, is not what § 441f says. A statute "says . . . what it means and means . . . what it says," *Germain*, 503 U.S. at 253-54, and § 441f says "make," unqualified.

Under the ordinary or natural meaning of "make," Defendants allegedly caused the contributions to exist or happen just the same as if they had turned over the donations to the campaigns themselves. Accordingly, the charged conduct falls within the text of § 441f.

Defendants also argue that FECA's structure precludes reading § 441f as proscribing pass-through contributions, as alleged here.  (Danielczyk MTD at 9-11.)  According to Defendants, reading § 441f in this manner expands the scope of § 441f "beyond its text in an effort to reach conduct that FECA expressly regulates elsewhere."  (Danielczyk MTD at 10.)  Specifically, Defendants argue that FECA regulates pass-through contributions in 2 U.S.C. § 441a(a)(8), and because pass-through contributions are regulated in § 441a(a)(8), they are not proscribed by § 441f.  *Id.*  § 441a(a)(8) states:

> For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate.

The subsection § 441a(a) is titled[5] "[d]ollar limits on contributions."  Section § 411a itself is entitled "[l]imitations on contributions and expenditures."

The Court disagrees that, as a matter of FECA's *structure*, the existence of § 441a(a)(8) forecloses reading §

---

[5] A heading or title of a statute cannot substitute for the operative text of that statute, so the Court looks to these titles only as informative.  *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("We find it informative that Congress placed § 1146(a) in a subchapter entitled, "POSTCONFIRMATION MATTERS.").

441f as prohibiting pass-through contributions, given that §
441f's plain text dictates the reading set forth above. *See*
*BedRoc Ltd.*, 541 U.S. at 183 (stating that a court's "inquiry
begins with the statutory text, and ends there as well if the
text is unambiguous"). Nonetheless, the Court agrees with
Defendants that statues should be construed to "fit, if
possible, all parts into an harmonious whole," *FTC v. Mandel*
*Brothers, Inc.*, 359 U.S. 385, 389 (1959), but sees this guidance
as counseling an opposite result.

Sections 441a(a)(8) and 441f serve different functions
in FECA and do different work. Section 441a(a)(8) dictates *how*
*much* one can "contribute" and against whose contribution limits
a "contribution" is counted. Section 441f dictates *whether* one
can "contribute" in a particular manner. Indeed, whether one is
"contributing" at all, for purposes of FECA, is governed by §
431(8)(A)(i), which defines the term "contribution" (yet another
provision with a different function). Reading these provisions
in harmony as a whole, one sets forth whether there is a
"contribution" (§ 431(8)(A)(i)), the next sets forth against
whose account that "contribution" is credited (§ 441a(a)(8)),
and the next sets forth whether one can even make a particular
type of "contribution" at all (§ 441f). That is not to say that
§ 441f's *role* in FECA, in prohibiting a certain kind of
"contribution," *in itself* provides that Defendants' charged

17

conduct is that kind of prohibited conduct. § 441f's *text* does that. This is only to say that "fit[ting] . . [these] parts [of FECA] into an harmonious whole," *Mandel Brothers*, 359 U.S. at 389, the *structure* of FECA does not foreclose the textual reading of § 441f set forth above.

In support of their structural argument, Defendants contend that reading § 441f as prohibiting the charged conduct here "conflat[es]" § 441f and § 441a, and "categorically ban[s] innocent conduct that Congress intended to allow." (Danielczyk MTD at 11.) Defendants propose a hypothetical to illustrate that Congress addressed false-name contributions and pass-through contributions separately and differently. (Danielczyk MTD at 10.) Suppose, say Defendants, a proud parent of a politically active college student reimbursed that student for her purchase of a ticket to a political fundraiser out of the belief that the daughter could not afford to attend. *Id*. According to Defendants, the parent's conduct in this scenario is not barred by § 441f, even though the money donated by the daughter to the campaign came not from the daughter, but from the parent. (Danielczyk MTD at 11.) Defendants argue that, instead of § 441f, that scenario is regulated by § 441a, which guards against any abuse in such a scenario by counting the daughter's donation against the parent's § 441a contribution limits. *Id.*

That is not the conduct Defendants are charged with
here.  Using Defendants' hypothetical and inserting the facts
here, the scenario would be one where a proud parent of a
politically active college student called his daughter *and*, *to
conceal the amount and the source of his contribution*, recruited
her to make a donation to a political campaign with the
assurance that he would repay her for the donation.  Indict. §§
11-12ai.  Under the Court's and the Government's reading of §
441f, that conduct would fall within § 441f.  Significantly, for
the parent's conduct to be a *criminal* violation of § 441f, the
parents would not only have to engage in the proscribed conduct,
but do so with the requisite *mens rea*, which the Court addresses
below.

The Supreme Court, in *dicta*, has addressed this very
scenario.  In *McConnell v. FEC*, 540 U.S. 93 (2003), the Court
held that a provision of FECA prohibiting minors from making
political contributions violated the First Amendment.  *Id.* at
231.  The Government, in arguing its position that the
prohibition on minor's contributions did not violate the First
Amendment, "assert[ed] that the provision protects against
corruption by conduit; that is, donations by parents through
their minor children to *circumvent contribution limits
applicable to the parents*."  *Id*. at 232 (emphasis added).  The
Court concluded that "the Government offer[ed] scant evidence of

19

this form of evasion," reasoning that "[p]erhaps the Government's slim evidence results from *sufficient deterrence of such activities* by § 320 of FECA, which prohibits any person from 'mak[ing] a contribution in the name of another person,' 2 U.S.C. § 441f." *Id*. (emphasis added). The Court plainly contemplated that § 441f applied to Defendants' hypothetical, *if* the parent *intended* to circumvent his contribution limits via his daughter.[6]

As is clear from this Court's discussion of *mens* rea below, Defendants' proud-parent hypothetical would only implicate § 441f where the parent's purpose was to circumvent his contribution limits through his daughter. That is § 441f's function in the structure of FECA. Section 431(8)(A)(i) determines whether there is a "contribution," § 441a(a)(8) determines against whose account that "contribution" is credited, and § 441f determines whether one can even make a particular type of "contribution" at all. Defendants argue that § 441a guards against any *abuse* by the hypothetical proud parent by counting the daughter's donation against the parent's § 441a contribution limits. (Danielczyk MTD at 11.) Section 441a certainly guards against that abuse, but § 441f does something else--it determines whether a certain type of contribution can

---

[6] As discussed more fully below, this does not read an additional element into § 441f, but only illustrates an example of facts upon which the requisite *mens rea* could be found.

be made *at all*, regardless of whether the amount complies with §
441a.  In other words, even if the proud parent donated $10.00
through his daughter, it *could* implicate § 441f (but not § 441a)
if he did so with the requisite *mens rea*.

### iii.    Superfluity

Defendants next argue that reading § 441f as banning
pass-through contributions renders the "entire provision of
FECA--1 U.S.C. § 441a(a)(8) superfluous."  (Danielczyk MTD at
12.)  This refers to the canon "against interpreting any
statutory provision in a manner that would render another
provision superfluous." *Bilski v. Kappos*, 130 S. Ct. 3218, 3228
(2010) (internal citations omitted).

Because, as set forth above, the plain text of § 441f
says what it says, any overlap in the Court's reading of § 441f
with § 441a(a)(8) may lead to some superfluity, but does not, in
light of the Court's review of § 441f's plain text, counsel
against this reading.  Although avoiding superfluity is "*a
cardinal principle*" of statutory construction, *TRW Inc. v.
Andrews*, 534 U.S. 19, 31 (2001), the "*preeminent* canon" of
statutory interpretation is that "the legislature says in a
statute what it means and means in a statute what it says
there." *BedRoc Ltd.*, 541 U.S. at 183 (emphasis added, internal
quotation marks and citation omitted).  Moreover, "[g]iven
fundamental difference in purpose [between § 441f and §

441a(a)(8)], evident from the text of the provisions as well as the context in which they were passed, the overlap is less troublesome than it would be if the two provisions purported to address the same matter." *O'Donnell*, 608 F.3d at 554-55. Because the preeminent canon of statutory construction leads the Court to read § 441f as above, and given the different functions of § 441f and § 441a(a)(8) within FECA and the fact that § 441f reaches conduct that 441a(a)(8) does not, the partial overlap and resulting superfluity between the two does not, in itself, foreclose the Court's reading of § 441f.

> iv. <u>The Rule of Lenity, the First Amendment, and Due Process</u>

Defendants next argue that the rule of lenity, the First Amendment, and due process concerns compel dismissal of Counts Two and Three. (Danielczyk MTD at 22.) The rule of lenity "leads [courts] to favor a more lenient interpretation of a criminal statute 'when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)). For the reasons set forth above, after consulting traditional canons of statutory construction, *id.*, § 441f unambiguously prohibits the conduct alleged here. Moreover, to the extent the statute is ambiguous, that ambiguity

is not sufficiently grievous to warrant the rule of lenity.  *See*
*Dolan v. United States*, 130 S. Ct. 2533, 2544 (2010) ("[A]fter
considering the statute's text, structure, and purpose, we
nonetheless cannot find a statutory ambiguity sufficiently
'grievous' to warrant [the rule of lenity's] application in this
case.").

Defendants argue for an alternative construction of §
441f's text.  Even granting this alternative construction,
however, "'[i]t is not the case . . . that a provision is
'ambiguous' for purposes of lenity merely because it [is]
possible to articulate a construction more narrow than that
urged by the Government." *United States v. Ehsan*, 163 F.3d 855,
857-58 (4th Cir. 1998) (quoting *Moskal v. United States*, 498
U.S. 103, 108 (1990) (internal quotation marks omitted)).
Accordingly, because § 441f "unambiguously *include[s]*" the
charged conduct, the rule of lenity does not dictate dismissal
here.  *See United States v. Groce*, 398 F.3d 679, 681-82 (4th
Cir. 2005) (finding that because the statutory term "d[id] not
unambiguously include the situation at issue, rule of lenity did
not require a sentence enhancement) (emphasis removed); *see also*
*O'Donnell II*, 608 F.3d at 555; *Boender*, 691 F.Supp.3d at 842.

Defendants next argue that the void-for-vagueness
doctrine compels dismissal.  (Danielczyk MTD at 23.)  "As
generally stated, the void-for-vagueness doctrine requires that

a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982)).  Again, § 441f defines the offense unambiguously and in plain terms, such that ordinary people can understand what is prohibited conduct.

Defendants argue that "Congress cannot, consistent with the First Amendment, turn political activities like otherwise permissible campaign contributions into an uncharted minefield of criminal liability."  (Danielczyk MTD at 23.) Whatever makes the alleged contributions here "otherwise permissible," the Supreme Court has held that, to combat corruption and there appearance thereof, Congress *can* make campaign contributions exceeding certain limits *impermissible*. *Buckley v. Valeo*, 424 U.S. 1 (1976).  In approving such limits, the Court no doubt also approved of Congress's right to sanction those who *intentionally try to evade* its limits.  To the extent such sanctions create a minefield, § 441f's *mens rea* requirement ensures that only those who intend to behave unlawfully find

themselves in it.  Accordingly, due process and First Amendment

principles are not implicated by the Court's reading of § 441f.[7]

> ### B.  *Mens Rea* (Counts Two, Three, Six, and Seven)

Defendants next argue that Counts Two and Three (as

well as Six and Seven) must be dismissed because the statutes

involved are so ambiguous that they could not be "knowingly and

willfully" violated.  The Government responds that the statutes'

meanings are clear, "not vague or debatable," and this Court has

found the same with respect to Counts Two and Three.  (Opp. at

27.)  Both these arguments take as a given, though, Defendants'

claim that, to fulfill the requisite *mens rea* for these counts,

Defendants "must have been specifically aware of the law[s']

commands and have intended to violate them," (Danielczyk MTD at

16).  This seems an odd premise to take at face-value, given the

common maxim, "familiar to all minds, that ignorance of the law

---

[7] Count Six charges Mr. Danielczyk with causing the candidate's campaign to submit a report to the FEC "that was materially false in reporting the source and amount of contributions to the campaign by a corporation" in violation of 18 U.S.C. § 1001(a)(2).  Indict. 28.  Defendants argue that to the extent the Government's theory as to the falsity of the statement is that Mr. Danielczyk or Galen "made contributions in the name of another, and that the contributions were falsely reported to the FEC in the name of another, that fails for the same reasons as the § 441f counts," *i.e.*, Counts Two and Three, because the individual contributors are the people who "made" the contributions to the campaign, not Mr. Danielczyk.  (Mot. at 27.) This argument fails for the same reasons set forth above with respect to Counts Two and Three. Mr. Danielczyk allegedly "made" the contributions just the same as the persons who transferred money to the campaign.  As the Government stated, "[i]n this case, the [Clinton] campaign filed the required quarterly finance report with the FEC in April 2007 which falsely included the names of the conduit contributors as the actual sources of the funds to the Clinton presidential campaign."  (Opp. at 38.)  Mr. Danielczyk allegedly "made" these contributions in the name of another, and by doing so allegedly caused the candidate's campaign to submit a materially false report to the FEC.

will not excuse any person, either civilly or criminally."
*Barlow v. United States*, 7 Pet. 404, 411 (1833); *see also Jerman
v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct.
1605, 1611 (2010) (quoting *Barlow*).  This Court will therefore
address the surprisingly thorny question of what *mens rea*
applies for these counts.

Counts Two and Three, again, charge the Defendants
with violating 2 U.S.C. § 441f, which states in relevant part:

> No person shall make a contribution in the
> name of another person.

The *mens rea* requirement for § 441f is again stated in 2 U.S.C.
§ 437g(d)(1)(A)(i), and applies to

> [a]ny person who *knowingly* and *willfully*
> commits a violation of any provision of
> this Act.

437g(d)(1)(A)(i) (emphasis added).  In addition, Counts Two and
Three involve 18 U.S.C. § 2(b), which states,

> Whoever *willfully* causes an act to be done
> which if directly performed by him or
> another would be an offense against the
> United States, is punishable as a
> principal.

Counts Six and Seven very similarly also involve §
2(b) as well as 18 U.S.C. § 1001(a)(2), which applies, in
relevant part, to:

> [W]hoever, in any matter within the
> jurisdiction of the executive, legislative,
> or judicial branch of the Government of the
> United States, *knowingly and willfully* . .

> . makes any false, fictitious, or
> fraudulent statement or representation.

Thus, Counts Two, Three, Six, and Seven involve *mens rea* standards of acting "knowingly" and "willfully."

All agree that "knowingly" is a "general intent" *mens rea* standard requiring "knowledge of the facts that constitute the offense." *Dixon v. United States*, 548 U.S. 1, 5 (2006) (citing *Bryan v. United States*, 524 U.S. 184, 191 (1998)); *United States v. George*, 386 F.3d 383, 389 n.6 (2d Cir. 2004) ("In contrast [to 'willingly'], the criminal statutory term 'knowingly' has attained a largely settled interpretation.").

The meaning of "willfully," however, "has long bedeviled American courts." *George*, 386 F.3d at 389. Indeed, "[t]he word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." *Bryan*, 524 U.S. at 191. This "chameleon word"[8] seems describe three levels of intent, as then-Judge Sotomayor observed in *United States v. George*.[9]

---

[8] *United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009) (citations omitted).

[9] *See also United States v. Kay*, 513 F.3d 432, 447 (5th Cir. 2007) ("The definition of 'willful' in the criminal context remains unclear despite numerous opinions addressing this issue. Three levels of interpretation have arisen that help to clear up the haze."). *Kay* went on to explain that the lowest level merely required that the defendant act intentionally, the intermediate level required knowledge of general unlawfulness (citing *Bryan*), and the highest level required specific knowledge of the terms of the statute being violated. *Id.* at 447-48.

i.    The Highest Level of Intent: *Ratzlaf* and *Cheek*

In select, rare instances, willfulness requires a finding that the defendant actually knew that he was violating a particular statute.  For instance, *Ratzlaf v. United States*, 510 U.S. 135 (1994), involved the crime of "structuring" cash deposits to evade federal deposit reporting requirements.  The Court observed that breaking single transactions into two or more segments of less than $10,000 is not intuitively nefarious and held that a defendant could only be liable where he actually knew of the anti-structuring law he was breaking.  *Id.* at 144-46.  Likewise, in *Cheek v. United States*, 498 U.S. 192 (1991), the Court noted that because the tax laws are so overwhelmingly complex, "Congress . . . softened the impact of the common law presumption [that ignorance of the law is no excuse] by making specific intent to violate the law an element of certain federal criminal tax offenses."  *Id.* at 199-200.  Like *Ratzlaf*, the Court held that in criminal tax cases, willfulness could only be found where the law imposed a duty, "the defendant knew of this duty, and . . . he voluntarily and intentionally violated [it]."  *Id.* at 201.

Thus, *Ratzlaf* and *Cheek* stand for the proposition that, in circumstances "where the obscurity or complexity" of a criminal statute "may prevent individuals from realizing that

seemingly innocent acts are, in fact, criminal," willfulness requires the defendant to have known that he was violating a specific law. *George*, 386 F.3d at 390.

ii.     The Intermediate Level of Intent: *Bryan*

The second category of willfulness was most prominently articulated in *Bryan v. United States,* 524 U.S. 184 (1998). There, the petitioner faced charges under 18 U.S.C. § 922(a)(1)(A), which forbids trading in or transporting firearms in interstate commerce without the appropriate license. The petitioner argued that the *Ratzlaf/Cheek* standard for willfulness applied, such that his guilt would depend on his awareness of the federal licensing requirement when he violated it. 524 U.S. at 189-90. The Court declined to extend *Ratzlaf* and *Cheek*, distinguishing them as "involv[ing] highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." *Id.* at 194. The Court instead held that "the willfulness requirement of § 924(a)(1)(D) does not carve out an exception to the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required." *Id.* at 196.

Many courts, including the Supreme Court and the Fourth Circuit, have since repeated this language with the intimation that it represents the general standard for willfulness in criminal law. For instance, in *Safeco Ins. Co.*

*v. Burr*, 551 U.S. 47 (2007), the Supreme Court cited *Ratzlaf*, *Bryan*, and *Cheek* for the proposition that, "when the term 'willful' or 'willfully' has been used in a criminal statute [as opposed to a civil one], we have regularly read the modifier as limiting liability to knowing violations." *Id.* at 58 n.9.  It further cited *Bryan* (and no other cases) in stating, "[t]hus, we have consistently held that a defendant cannot harbor such criminal intent unless he 'acted with knowledge that his conduct was unlawful.'" *Id.* (quoting *Bryan,* 524 U.S. at 193).

The Fourth Circuit used similar language in *United States v. Bursey.* 416 F.3d 301, 308-09 (4th Cir. 2005).  There, the defendant was convicted of "willfully and knowingly" entering and remaining in a restricted area during a visit by the President.  *Id.* at 303.  The defendant argued that he could not have possessed the requisite *mens rea* because, although he was advised that he was in a restricted area and required to leave he was never told that the area was a "federally restricted zone, so designated by the secret service."  *Id.* at 308.  He argued, in other words, for the rule from *Cheek* and *Ratzlaf* (that he had to be aware of the law he was violating). What he got instead was *Bryan*; the Court again repeated the language that "for a defendant to have acted willfully, he must merely have 'acted with knowledge that his conduct was unlawful.'"  *Id.* at 308-09 (citing *Bryan*).

*Bursey* is typical of cases applying *Bryan*, in that it seems to treat *Bryan* as *the* alternative to *Ratzlaf* and *Cheek*,[10] when in fact *Bryan* is *an* alternative, and an atypical one at that.[11]  Indeed, then-Judge Sotomayor wrote in *George* that the significance of *Cheek*, *Ratzlaf*, *and Bryan*, "lies in their atypicality."  386 F.3d at 392.  As outlined below, her opinion explains at length that the baseline for criminal willfulness remains simple intentionality, that ignorance of the law is still (usually) no excuse, and that the standard is heightened solely for conduct that is wrongful only because a statue makes it so.

### iii.    The Baseline Level of Intent: the Standard Case

As noted in *George*, Judge Learned Hand explained nearly a century ago that the term "willful" "means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is

---

[10] *See, e.g., United States v. Roth*, 628 F.3d 827, 833-35 (6th Cir. 2011) (citing *Bryan* and invoking its standard in finding that the defendant did not need to know that particular items being exported are specifically listed on a "munitions list" prohibiting their export); *United States v. Mousavi*, 604 F.3d 1084, 1092-94 (9th Cir. 2010) (same, with respect to alleged violations of the International Economic Emergency Powers Act); *United States v. Bell*, 598 F.3d 366, 370-71 (7th Cir. 2010) (same, with respect to violations of the Deadbeat Parents Punishment Act of 1998); *United States v. Starnes*, 583 F.3d 196, 211-12 (3d. Cir. 2009) (same, with respect to violations of §§ 2(b) and 1001 (the same statutes at issue in Counts Six and Seven in this case)).
[11] Tellingly, this Court has not located a single case where *Bryan* was applied to a defendant's *benefit*, *i.e.*, where a defendant was able to obtain a favorable ruling from invoking *Bryan* as requiring a *heightened mens rea* above the baseline.

breaking the law."[12]  *Id.* at 393 (citing *American Surety Co. of New York v. Sullivan*, 7 F.2d 605, 606 (2d Cir. 1925)).

Recognizing that "*Bryan's* discussion of the content of the *mens rea* term 'willfully' in the challenged statute [was] not accompanied by a discussion of the basis for this definition," then-Judge Sotomayor cited a litany of Supreme Court cases in explaining that, in fact, *Ratzlaf*, *Cheek*, and *Bryan* merely reflect the Supreme Court's concern that "the obscurity or complexity of [a] particular criminal statute may prevent individuals from realizing that seemingly innocent acts are, in fact, criminal."  *Id.* at 392 (citing *Carter v. United States*, 530 U.S. 255, 269 (2000) ("The presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.") (internal quotation marks omitted); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71-73 (1994) (child pornography conviction required proof of knowledge that children depicted were minors); *Staples v. United States,* 511 U.S. 600, 619–20 (1994) (conviction for possession of unregistered machine gun required knowledge of the features of

---

[12] Judge Hand also remarked to Herbert Wechsler, then the Reporter for the Model Penal Code, that "[willfully] is a very dreadful word.... It's an awful word! It is one of the most troublesome words in a statute that I know. If I were to have the index purged, 'willful' would lead all the rest in spite of its being at the end of the alphabet." *United States v. Hayden*, 64 F.3d 126, 129 n.5 (3d Cir. 1995) (quoting ALI Proceedings 160 (1955), quoted in Model Penal Code and Commentaries § 2.02, at 249 n.47 (Official Draft and Revised Comments 1985)) (internal quotation marks omitted).

the gun that brought it within the scope of the statute);
*Liparota v. United States,* 471 U.S. 419, 426 (1985) (conviction
for unauthorized use of food stamps requires knowledge that use
of food stamps was illegal, because absent that requirement, the
statute would "criminalize a broad range of apparently innocent
conduct")).

Thus, "knowledge of general unlawfulness is
unnecessary under statutes criminalizing conduct whose
wrongfulness is obvious from the surrounding context." *United
States v. Kelly*, 368 F. App'x 194, 198 (2d Cir. 2010).  Indeed
such knowledge is unnecessary where the behavior proscribed is
wrongful in and of itself, because in such instances, the
defendant is on notice that, in intentionally engaging in that
behavior, he or she probably broke the law.  *George*, 386 F.3d at
395.  Only conduct that is wrongful solely because it is
proscribed by statute and that seemingly could be innocent
warrants *Bryan's* heightened *mens rea* protection, and even then,
only those laws that are abnormally technical or obscure, such
as the tax code, warrant *Cheek* and *Ratzlaf's* strictest *mens rea*.

iv.    The Requisite *Mens Rea* in this Case

Here, Defendants argue they cannot have met the *mens
rea* for Counts Two, Three, Six, and Seven because the statutes
at issue were subject to multiple reasonable interpretations,
such that they could not be "knowingly and willfully" violated.

(Danielczyk MTD at 16.)  Putting aside this Court's having found

those statutes to be unambiguous, Defendants' argument depends

upon this Court adopting a *Cheek/Ratzlaf* view of *mens rea* for

the statutes charged in this case, because only under *Cheek* and

*Ratzlaf* would Defendants' have needed to be "specifically aware

of the law's commands and [to] have intended to violate them."

*Id.*  This Court will not adopt that view.

Beginning with Counts Two and Three, compared with

antistructuring or tax laws, as in *Ratzlaf* or *Cheek*, individual

campaign contribution laws are more intuitive and less complex.

As the Supreme Court explained *Ratzlaf*, "currency structuring is

not inevitably nefarious. . . .  Nor is a person who structures

a currency transaction invariably motivated by a desire to keep

the Government in the dark."  510 U.S. at 144-45.  Likewise in

*Cheek*, the Court explained

> The proliferation of statutes and
> regulations has sometimes made it difficult
> for the average citizen to know and
> comprehend the extent of the duties and
> obligations imposed by the tax laws.
> Congress has accordingly softened the
> impact of the common-law presumption by
> making specific intent to violate the law
> an element of certain federal criminal tax
> offenses. Thus, the Court almost 60 years
> ago interpreted the statutory term
> "willfully" as used in the federal criminal
> tax statutes as carving out an exception to
> the traditional rule.  This *special
> treatment* of criminal tax offenses is
> largely due to the complexity of the tax
> laws.

498 U.S. at 199-200 (emphasis added). That distinguishes the tax cases Defendants present in support of their *mens rea* claims, all of which are, in essence, predecessors to *Cheek*.

In *United States v. Critzer*, the Court reversed a conviction for willful tax evasion where the law under which the Defendant was charged was "so uncertain that even co-ordinate branches of the United States government plausibly reach directly opposing conclusions." 498 F.2d 1160, 1162 (4th Cir. 1974). The Court noted that, "[e]ven if [the defendant] had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required." *Id.* As a result, "the element of willfulness could not be proven" in that case. *Id.* at 1163. *United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985), and *United States v. Pomponio*, 429 U.S. 10 (1976), likewise involved vague and highly-debatable theories of tax law. *Pomponio*, cited by Defendants along with *Ratzlaf*, explicitly limited its analysis to the tax laws at issue in that case. 429 U.S. at 12 ("The Court, in fact, has recognized that the word 'willfully' *in these statutes* generally connotes a voluntary, intentional violation of a known legal duty.") (emphasis added).

Many areas of federal law are "complex," including laws governing campaign contributions.[13]  In this Court's view, however, such laws are not at the level of the tax code in their likelihood of ensnaring innocent conduct through sheer bewilderment.  Campaign contributions laws are not so complex or surprising that the average citizen would likely be trapped by them.  Thus, this Court will not extend *Ratzlaf* and *Cheek's* highest *mens rea* standard to the field of election law and will not dismiss Counts Two and Three for inability to prove *mens rea*.

As for *Bryan's* intermediate standard, as explained in *George*, the critical question is whether the law in question risks capturing otherwise seemingly innocent conduct.  If, as in *George*, there is no conceivably meritorious justification for the alleged *actus reus*, then *Bryan's* concern for capturing seemingly innocent conduct is not implicated.  386 F.3d at 395.  Here, however, it appears that seemingly innocent conduct *could* be captured by § 441f.  Returning to the proud-parent hypothetical, the parent reimbursing his daughter's fundraiser ticket is not intuitively "bad," yet his actions would meet the

---

[13] *See* Steve Simpson & Paul Sherman, Op-Ed., *Stephen Colbert's Free Speech Problem*, Wall St. J., May 19, 2011, at A15 (quoting Stephen Colbert lamenting on the difficulty of forming a political action committee, "Why does it get so complicated to do this.  I mean, this is page after page of legalese . . . . All I'm trying to do is affect the 2012 Election.  It's not like I'm trying to install iTunes").

*actus reus* for § 441f.  Because § 441f could capture seemingly

innocent conduct, it calls for *Bryan's* heightened *mens rea*.

Thus, for Counts Two and Three, the Government must

prove that Defendants intended to violate the law (whatever the

law was); but it need not prove Defendants' awareness of the

specific law's commands.  *See Bryan*, 524 U.S. at 196.  Because

Defendants could have intended to act unlawfully while being

unaware of exactly what the law required, this Court disagrees

with Defendants' argument that Counts Two and Three require

dismissal due to ambiguity.

As for Counts Six and Seven, a split appears to exist

between the Third and D.C. Circuits as to the requisite *mens rea*

for Sections 2(b) and 1001 combined.

The Third Circuit applied *Ratzlaf* to a criminal charge

linking Sections 2(b) and 1001 in *United States v. Curran*, 20

F.3d 560 (3d Cir. 1994).  The Defendant in *Curran* asked a number

of his employees to write personal checks to several campaigns

for federal office, then reimbursed them in cash.  *Id.* at 562-

63.  Considering the proper charge for "willfulness" under the

statutes at issue--then an issue of first impression, *see id.* at

568--the Court found three similarities between the statutes

discussed in *Ratzlaf* and those charged in that case:

> (1) The disclosure obligations imposed by
> the Election Campaign Act correspond with
> those dictated by the currency reporting

> statute.  This similarity involves the
> defendant's knowledge of a third party's
> duty to disclose information to a
> government agency.
>
> (2) The underlying conduct is not
> "obviously 'evil' or inherently 'bad.'"  We
> see little difference between breaking a
> cash transaction into segments of less than
> $10,000 and making a contribution in the
> name of another.
>
> (3) The conduct at issue in both cases was
> made illegal by a regulatory statute.

*Id.* at 569.

Because of these findings, the Court held that the
Government was required to prove that (1) the defendant was
aware that campaign treasurers were legally bound to accurately
report the sources of their contributions, (2) that the
defendant's actions were taken with the specific intent to cause
the treasurer to submit false reports, and (3) that the
defendant knew that his actions were unlawful.  *Id.* at 570-71.

More recently, though, the Third Circuit backpedaled
from a *Ratzlaf*-like standard to a *Bryan*-like one.  Citing *Bryan*,
it held in *United States v. Starnes* that the required *mens rea*
for Sections 2(b) and 1001 was "knowledge of the general
unlawfulness of the conduct at issue."  583 F.3d 196, 211
(2009).  Thus, it now seems that no circuit courts currently
invoke a *Ratzlaf* or *Cheek* level of *mens rea* with respect to
Sections 2(b) and 1001.

The D.C. Circuit considered and expressly rejected *Curran*, requiring no heightened *mens rea* for these statutes. In *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999), the Court found that *Curran* "extend[ed] *Ratzlaf* too far." *Id.* at 522. The Court noted that the antistructuring statute in *Ratzlaf* explicitly applied to persons "willfully violating" that statute. *Id.* This language, the Court held, created a narrow exception inapplicable to the *mens rea* required by Sections 2(b) and 1001, which do not explicitly require their "willful violat[ion]." *Id.* Thus, the Court held that "the government may show *mens rea* simply by proof (1) that the defendant knew that the statements to be made were false (the *mens rea* for the underlying offense, § 1001), and (2) that the defendant intentionally caused such statements to be made by another (the additional *mens rea* for § 2(b))." *Id.; see also United States v. Gabriel*, 125 F.3d 89, 99-102 (2d Cir. 1997), *abrogated on other grounds by Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005); *United States v. Fieger*, No. 07-cr-20414, 2008 WL 996401, at *5-6 (E.D. Wis. Apr. 8, 2008) (following *Hsia*); *United States v. Pierce O'Donnell*, No. CR 08-872 (C.D. Cal. Jun. 8, 2009) (following *Hsia*, cited by *Defendants* here).

*Hsia's* ruling rests on an analysis that seems no longer valid. It focused on the absence of the words "willfully violat[es]" in Section 2(b), which instead applies where a

person "willfully causes" an act to be done that happens to violate a statute. But the Supreme Court made clear, in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* that the combination of a *mens rea* requirement with the word "violation" does not create a mistake of law defense. 130 S. Ct. 1605, 1613 (2010). Thus, *Hsia's* grounds for distinguishing *Ratzlaf* are no longer persuasive. *See also United States v. Moore*, 612 F.3d 698 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (noting that "*Hsia* referenced a 1994 Third Circuit opinion [*Curran*] that pre-dated the Supreme Court's clarifying decisions in *Bryan* and later cases," and that, as a result, *Hsia's mens rea* ruling may need to be reconsidered).

     With the Fourth Circuit never having spoken on this issue, this Court applies the same analysis as with Counts Two and Three. First, in considering whether to apply *Ratzlaf* and *Cheek's* strictest *mens rea* standard, this Court again considers whether the law reaches a tax-like level of complexity or obscurity. That is a more difficult question with respect to Sections 2(b) and 1001 because those sections embrace a far broader range of conduct that Sections 2(b) and 441f.

     The act of causing a false, fraudulent, or fictitious statement to be made to an executive agency *could* easily apply in a tax case like *Cheek*, *see, e.g.*, *Clancy v. United States*, 365 U.S. 312, 313 (1961) (defendants charged with making false

statements under § 1001 and with tax evasion under § 7201 (the
same tax statute as in *Cheek*)), *as well as* a firearms dealing
case like *Bryan*, *see, e.g.*, *United States v. Kubowski*, 85 F.
App'x 686 (10th Cir. 2003) (defendants charged with making false
statements under § 1001 and with dealing firearms without a
license under 18 U.S.C. § 924(d) (the same statue as in *Bryan*)).

Thus, because *Cheek* and *Bryan's mens rea* standards are
different, § 1001 cannot apply a uniform *mens rea* standard; the
*mens rea* to be applied must depend on the conduct charged (*i.e.*,
the law (if any) that makes the statement at issue allegedly
false, fraudulent, or fictitious).  Here, the Court has already
found that *Bryan's mens rea* applies to the law proscribing the
making of a campaign contribution in the name of another.  The
hypothetical innocent proud-parent is equally capable of meeting
the *actus reus* for Sections 2(b) and 1001 as he was for Counts
Two and Three.  *Bryan's mens rea* standard must therefore apply
to a false-statements charge based on a charge of making a
campaign contribution in the name of another.

\*    \*    \*

Thus, for the reasons explained in Parts A and B of
this Memorandum Opinion, Defendants' arguments as to statutory
construction and *mens rea* do not provide a basis for dismissing
Counts Two, Three, Six, and Seven.

C.  Count Four and *Citizens United*

Count Four charges Defendants with directing contributions of corporate money to the 2008 Presidential Campaign in violation of 2 U.S.C. § 441b(a), 2 U.S.C. § 437g(d)(1)(A)(i), and 18 U.S.C. § 2.  Section 441b(a) of FECA bans direct corporate contributions to campaigns for federal office.  Defendants claim that under the logic of the Supreme Court's decision in *Citizens United v. FEC*, 130 U.S. 876 (2010), this ban violates the First Amendment and that Count Four must therefore be dismissed.

*Citizens United* involved a non-profit corporation that produced a highly critical film about Hillary Clinton during her 2008 presidential candidacy.  Because the film was in effect "a feature-length narrative advertisement that urges viewers to vote against Senator Clinton," it was subject to 2 U.S.C. § 441b's provision barring corporations or unions from making *independent expenditures* as defined by 2 U.S.C. § 431(17) or expenditures for "electioneering communications" as defined by 2 U.S.C. § 431(f)(3).  The Court held the independent expenditure ban unconstitutional because it found that independent expenditures do not trigger the government's interest in preventing *quid pro quo* corruption or the appearance of corruption.

This ruling stemmed largely from the Supreme Court's opinions in *Buckley v. Valeo*, 424 U.S. 1 (1976), and *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 784 (1978). *Buckley* involved FECA's limits on *direct* campaign contributions and on *independent* election-related expenditures. Dealing first with direct contribution limits, the Court found a "sufficiently important" government interest in "the prevention of corruption and the appearance of corruption" that justified limiting the amount a person could contribute to a federal campaign. *Id.* at 25. The Court was concerned that large direct contributions, *i.e.*, those *over* the limits, could be used "to secure a political *quid pro quo*." *Id.* As for independent expenditure limits, however, the Court found less *quid pro quo* risk "because [of] the absence of prearrangement and coordination" between the donor and any specific candidate. *Id.* at 47-48.

Importantly, because of the strong government interest in preventing *quid pro quo* corruption or its appearance, *Buckley* permitted FECA's limits on direct contributions even though the contributions implicate fundamental First Amendment interests. *Id.* at 23. It follows that contributions *within FECA's limits* do not create a risk of corruption or its appearance--indeed, that is the point of the limits. *Id.* at 25.

Two years after *Buckley*, the Supreme Court in *Bellotti* considered a Massachusetts statute prohibiting corporate

contributions or expenditures to influence the outcome of a vote on any referendum. On one hand, the Court explicitly declined to rule on the constitutionality of the statute's ban on "corporate contributions or expenditures" for the purpose of supporting or opposing a campaign for political office. *Id.* at 787 n.26. On the other hand, the Court found that the identity of a corporation as "speaker," especially in the context of political speech, is of no consequence to the First Amendment protection its speech is afforded. *Id.* at 784-85.

The Supreme Court seized on the latter point in *Citizens United*, combining it with *Buckley* to strike down a ban on independent corporate expenditures. The Supreme Court's logic was that because *Buckley* found that independent contributions by human beings do not corrupt, and because *Bellotti* held that "the First Amendment does not allow political speech restrictions based on a speaker's corporate identity," 130 S. Ct. at 903, corporations cannot be banned from making the same independent expenditures as individuals. 130 S. Ct. at 899-903.

That logic is inescapable here. If human beings can make direct campaign contributions *within* FECA's limits without risking *quid pro quo* corruption or its appearance, and if, in *Citizens United's* interpretation of *Bellotti*, corporations and human beings are entitled to equal political speech rights, then

corporations must also be able to contribute within FECA's limits.

Only one other court appears to have ruled on this issue since *Citizens United*. In *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, the plaintiffs challenged a state-law ban on corporate contributions to candidates and political parties, arguing that the ban was unconstitutional under *Citizens United*. 741 F. Supp. 2d 1115 (D. Minn. 2010). The court disagreed, finding that *Citizens United's* holding was limited to corporate independent expenditures and was not a repudiation of *Buckley's* limitations on direct contributions to candidates. Because *Citizens United* did not overrule *Buckley*, the court held, a ban on direct corporate contributions remained constitutional. *Id.* at 1132-34.

This Court agrees that *Citizens United* did not overrule *Buckley*. Indeed, *Citizens United* noted that limits on direct contributions to candidates, "unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption." *Citizens United*, 130 S. Ct. 909 (citing *McConnell v. FEC*, 540 U.S. 93, 136-38 (2003)). But this Court respectfully disagrees with the *Swanson* court as to the import of these facts. That *Citizens United* did not overrule *Buckley* and that it reaffirmed *Buckley's* concern with preventing *quid pro quo* corruption does not justify *flatly* banning

*corporations* from making direct donations while permitting *individuals* to make such donations within FECA's limits.

This Court recognizes that it must strive to avoid rendering constitutional rulings except where absolutely necessary. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936). But for better or worse, *Citizens United* held that there is no distinction between an individual and a corporation with respect to political speech. Thus, if an individual can make direct contributions within FECA's limits, a corporation cannot be banned from doing the same thing. So because individuals can directly contribute to federal election campaigns within FECA's limits, and because § 441b(a) does not allow corporations to do the same, § 441b(a) is unconstitutional and Count Four must be dismissed.[14]

### D. Bill of Particulars as to Count Six

Mr. Danielczyk argues that the Count Six of the Indictment fails to set forth a false statement to an executive agency that he caused to be made and seek a bill of particulars identifying the document allegedly containing false statements, as well as the allegedly false statements itself.

---

[14] Importantly, this finding hardly gives corporations a blank check (so to speak) to directly contribute *unlimited amounts* to federal campaigns. Rather, corporations are subject to the same FECA contribution limits as individuals. *See* 2 U.S.C. § 441a(a) (listing limits on contributions from a "person"); 2 U.S.C. § 431(11) ("When used in this Act . . . [t]he term 'person' includes an individual, partnership, committee, association, *corporation*, labor organization, or any other organization or group of persons." (emphasis added)).

Pursuant to Rule 7(f), the Court may direct the Government to file a bill of particulars.  The decision whether to grant or deny a motion for a bill of particulars is within the sound discretion of the trial court.  *United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973).  The purpose of a bill of particulars is "to enable a defendant to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." *United States v. Schembari*, 484 F.2d 931, 934-935 (4th Cir. 1973) (citing *United States v. Dulin*, 410 F.2d 363, 364 (4th Cir. 1969)).  It "is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Medical Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985) (citing *Anderson,* 481 F.2d at 690).  Instead, a bill of particulars "merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (citations omitted).  If "the indictment adequately details the charges, or the information requested is otherwise available, then no bill of particulars is required." *United States v. Esquivel*, 755 F.

Supp. 434, 436 (D.D.C. 1990) (citing *United States v. Butler*,

822 F.2d 1191, 1193 (D.C. Cir. 1987)).

Courts have found a bill of particulars unnecessary

where the Government opens its files to the defendant.  *See,*

*e.g., Schembari*, 484 F.2d at 935 (upholding the trial judge's

denial of a bill of particulars because "the underlying

objectives of a Rule 7(f) motion were fully satisfied by the

government's voluntary disclosure of its file"); *United States*

*v. Duncan*, 598 F.2d 839, 849 (4th Cir. 1979) (finding that the

"appraisal function of an indictment" may be satisfied if the

Government opens its investigative file for the Defendant's

inspection).  "Open file" discovery, however, is not required.

*See United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 782

(E.D. Va. 2004) (finding a bill of particulars unwarranted where

the government had provided and would continue to provide the

facts and circumstances of the offense through ongoing

discovery).

Here, it seems that the Government made clear in its

Opposition brief precisely the document and false statements at

issue.  The Government said: "In this case, the [Clinton]

campaign filed the required quarterly finance report with the

FEC in April 2007 which falsely included the names of the

conduit contributors as the actual sources of the funds to the

Clinton presidential campaign."  (Opp. at 38.)  This statement

informed Mr. Danielczyk as to the document containing the allegedly false statements, as well as the false statements themselves.  Because the April 2007 FEC Report was turned over in discovery, no bill of particulars is needed here.

E.   Sufficiency of Count Seven

Count Seven of the Indictment alleges that Mr. Danielczyk "knowingly and wilfully caused the submission of a materially false, fictitious, and fraudulent statement and representation" in violation of 18 U.S.C. § 10010(a)(2). Indict. ¶ 31.  That allegedly false statement is contained in a December 2007 letter that Galen's outside counsel sent the FEC detailing the conduct underlying the FECA counts of the indictment, specifically the statement that the reimbursements of contributions to the Presidential Campaign were bonus payments.  Indict. ¶¶ 13b, 13e.  Mr. Danielczyk argues that the statements contained in it were not false and, even if they were false, were not "material" for purposes of § 1001.  (Danielczyk MTD at 28.)

In terms of actual falsity, Mr. Danielczyk essentially argues that Count Seven misrepresents the statement he made to the FEC.  Whereas Count Seven alleges that the letter falsely represented to the FEC that "reimbursements of contributions . . . were bonus payments for work performed," (Indict. ¶ 31), Mr. Danielczyk notes that the letter's executive summary actually

49

states that "*some* of the reimbursements *were associated* with a planned bonus related to the consummation of a corporate transaction." Thus, Mr. Danielczyk argues, "[t]o the extent Count 7 rests on the premise that [his letter] denies the payments were reimbursements and represents them to be bonuses instead, that is simply incorrect," because his letter in fact admits that the payments were reimbursements and that they were improper. (Danielczyk MTD at 28-29.)

In this Court's view, Count Seven rests on the much simpler premise that, in fact, the reimbursements were not bonus payments at all and that it was a lie to tell the FEC otherwise. That premise is not negated by the statement that "some" of the reimbursements were associated with bonuses, as that means "some" were not. Moreover, the body of the letter states that "Mr. Danielczyk stated that the checks provided" to employees "at or about the time of the" 2007 campaign event "were the first instalment on a series of bonus payments [Danielczyk] intended to make as a result of the [corporate] transaction, although [Danielczyk] acknowledges that the payments were timed to allow employees and others to attend" the 2007 campaign event. *Id*. at 6. This statement flatly provides that the payments "were the first instalment on a series of bonus payments," something that may or may not be true. The Indictment simply charges that it was not.

Mr. Danielczyk next argues that Count Seven's allegedly false statement is immaterial. (Danielczyk MTD at 29.) Materiality is an element of a § 1001 violation, and the allegedly false statement must have had "'a natural tendency to influence agency action or [be] capable of influencing agency action.'" *United States v. Ismail*, 97 F.3d 50, 60 (4th Cir. 1996) (quoting *United States v. Norris*, 749 F.2d 1116, 1122 (4th Cir. 1984)). Mr. Danielczyk argues that the letter "disclosed to the FEC the entire course of conduct and [Galen's outside counsel's] conclusion that campaign laws had been civilly violated. (Danielczyk MTD at 29.) He claims that "the additional statement that reimbursements were *also* associated with bonus payments was not 'capable of influencing' how the FEC chose to handle the matter." *Id*. (emphasis in original).

"Materiality, as an element of a criminal offense, is a question of fact (or at the very least, a mixed question of law and fact) to be resolved by the fact finder." *United States v. Garcia-Ochoa*, 607 F.3d 371, 376 (4th Cir. 2010). And here, as Mr. Danielczyk's letter devotes a significant amount of time to discussing this bonus claim, this Court finds sufficient ground to leave it to the jury whether that bonus claim was material to the FEC.

F.   The Objects of the Conspiracy Alleged in Count
     One Corresponding to Counts Two, Three, and Four

Finally, Defendants argue that Counts Two, Three, and Four must be dismissed from the Indictment as the objects of Defendants alleged conspiracy.  Because this Court is dismissing Count Four but not Counts Two and Three, this Court agrees solely with respect to Count Four.  As this Court finds that 2 U.S.C. § 441b(a) is unconstitutional following *Citizens United*, a violation of that statute can no longer serve as the object of a conspiracy.  *United States v. Burgos*, 94 F.3d 849, 860 (4th Cir. 1996) ("[T]he essence of [a conspiracy] is an agreement to commit an *unlawful act*.") (emphasis added).  Thus, Paragraph 10(b), which repeats Count Four's allegations as an object of the conspiracy, must be struck.

## IV.  Conclusion

For these reasons, the Court will grant dismissal with respect to Count Four and Paragraph 10(b) from the Indictment, and will deny dismissal as to the remaining counts.


                                    _____/s/_____
May 26, 2011                              James C. Cacheris
Alexandria, Virginia            UNITED STATES DISTRICT COURT JUDGE